# EXHIBIT A

FILED
Gary Harrison
CLERK, SUPERIOR COURT
2/16/2023 6:52:46 PM
BY: ALAN WALKER  /s/
DEPUTY

1   Christine Parsons
    Pro se Plaintiff
2   1551 Spring Water Place
    Highland Ranch, CO 80129
3   christine.parsons@live.com
    (720) 341-7546
4

5           **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

6              **IN AND FOR THE COUNTY OF PIMA**

7                                             C20230734

8   Christine Parsons,                  Case Number:

9              Plaintiff,

10  v.                                  **COMPLAINT** HON. GARY J. COHEN

11                                      **Jury Trial Demand**

12  Acadia Healthcare Company, Inc., Sierra
    Tucson LLC and Sierra Tucson, Inc.

13             Defendants.

14                        **COMPLAINT**

15      Plaintiff Christine Parsons, for her Complaint against Defendants Acadia

16  Healthcare dba Sierra Tucson, LLC., ("Defendants"), states as follows:

17                         **PARTIES**

18      1.   Plaintiff Christine Parsons ("Plaintiff"), is a 36-year-old female, and is hard of

19  hearing in both ears. She is a resident of Colorado who received behavioral health treatment

20  in Acadia Healthcare's Sierra Tucson facility in Tucson, Arizona from February 17, 2021

21  through March 23, 2021.

22      2.   Defendant Acadia Healthcare Company, Inc., is a provider of behavioral healthcare

23  services. Acadia operates a network 246 behavioral healthcare facilities with

24  approximately 10,800 beds in 39 states, including Arizona, and Puerto Rico. Acadia

25  provides behavioral healthcare and substance use services to its patients in a variety of

26  settings, including inpatient psychiatric hospitals, specialty treatment facilities, residential

27  treatment centers and outpatient clinics. Defendant Acadia Healthcare Company, Inc. owns

28  and operates the Sierra Tucson facility in Tucson, Arizona.

3.    Sierra Tucson provided inpatient and outpatient services including the various types of specific recovery programs, including a Mood & Anxiety Program that treats various Mood Disorders.

4.    Sierra Tucson, Inc., a foreign corporation, and Sierra Tucson LLC, an Arizona Corporation, also own and operate the Sierra Tucson facility.

**JURISDICTION AND VENUE**

5.    This Court has jurisdiction over Plaintiff's claims alleged here because the value of this case exceeds $10,000 dollars.

6.    Venue is proper in Pima County under A.R.S. § 12-401 because Defendant operates its Sierra Tucson facility in Pima County, and all of the events or omissions giving rise to Plaintiff's claims occurred in Pima County.

7.    Pursuant to Arizona Rules of Civil Procedure, Rules 26.2(c)(3), the Court should assign this case to Tier 3.

**FACTUAL ALLEGATIONS**

8.    Plaintiff has a BTE Oticon hearing aid in her right ear and reads lips. The hearing aid amplifies sound but does not restore hearing within normal limits. The hearing aid can be used with her iPhone's Bluetooth features to connect to a TV or phone.

9.    Due to the inherent limitations of lipreading, she cannot make out most of the aural information that is presented during important healthcare communications, such as group and individual therapy, lectures, and consultations. It is not possible for people who lipread to consistently understand everything that is said by lipreading alone. Common difficulties associated with lipreading include but are not limited to: normal speech is too fast to lipread easily, many sounds are not seen on the lips, many speech patterns look similar on the lips, and many sounds look alike, even though they are different.

10.    There are many factors outside of Plaintiff's control that reduce the effectiveness of lipreading because many people, including that healthcare professionals and other patients may not speak clearly, have facial hair or accents that interferes with lipreading, cover parts of their mouth when speaking, and not look directly at the person who is lipreading.

11. In any group therapy, large group setting, consultation, or other communication involving more than one speaker, the ability to read lips is decreased because aural information is lost when the speaker changes without time or cues for the lipreader to follow.

12. Lipreading is hard work and takes a lot of energy, which may be impacted for patients in a behavioral health care crisis on specific medications that may produce side effects that interfere with attention and concentration or produce fatigue or sleepiness. This means that important healthcare communications require auxiliary aids and services.

13. Plaintiff's husband Sean Parsons, contacted Sierra Tucson for information about their services and programs when Plaintiff required an inpatient behavioral health stay. During the week of February 8, 2021, Mr. Parsons had several phone calls and online chats using Sierra Tucson's chat function with Admissions Coordinator Steven Goldsmith to learn more about the program.

14. During their contacts, Mr. Parsons told Mr. Goldsmith that Plaintiff has severe hearing loss, uses one hearing aid, and uses lipreading. Mr. Goldsmith described the Sierra Tucson behavioral health therapy services as being primarily one-on-one services with some small groups. Based on this information, Mr. Parsons and his wife selected Sierra Tucson.

15. Plaintiff was admitted to Sierra Tucson on February 17, 2021 for an inpatient stay at Sierra Tucson in the facility's Anxiety and Mood Disorder Program.

16. During Plaintiff's stay at Sierra Tucson, patients and staff were required to wear masks and patients and staff used opaque masks that prevented Plaintiff from lipreading.

17. On her first day at Sierra Tucson, Plaintiff informed all staff that she encountered, including nursing staff, that she was hard of hearing and could not understand clearly what the staff was saying with their masks.

18. During the hospitalization, Sierra Tucson's COVID-19 protocol required staff and patients to always wear a facemask. The facemasks used were opaque, making it impossible for Plaintiff to read lips to aid in her communication.

19.   Plaintiff asked Sierra Tucson facility staff to take steps to provide effective communication because she could not read lips when staff and other patients were using opaque masks.

20.   After two days, Sierra Tucson transferred Plaintiff from their locked hospital setting to their unlocked residential treatment campus.  When Plaintiff met with the head nurse and notified her that she needed accommodations for her disability, Plaintiff told her that no one was doing anything to accommodate her communication needs. This nurse, immediately wrote an email to get this solved but the email did not produce any change in her circumstances.

21.   From February 17, 2021 to March 19, 2021, Defendants did not assess Plaintiff's communication needs, develop an effective communication access plan, provide auxiliary aids or services, such as Communication Access Realtime Translation (CART) or provide assistive technology to connect the Bluetooth technology of her hearing aid to microphones worn by group therapists or lecturers, or provide clear, anti-fogging masks as a reasonable modification to provide effective communication.  *See* Exhibit A-1, an image of a clear, anti-fogging mask and A-2, an image of the type of mask with a clear cut-out that fogs.

22.   CART transcribes and translates spoken text and sound into words. The text appears in realtime — while the words are spoken or played — on a big screen that everyone can see, on a laptop, or on a mobile device. *See* Exhibit B, an image from Deaf, Inc.'s website showing how CART works.

23.   Defendants delivered most of the behavioral health services in lecture style in a gym, large cafeteria, or other large meeting room.  Often about 30-40 patients attended the lectures. The lectures allowed for patients to ask questions.

24.   Plaintiff could not read lips at all in these settings because she was not close enough to the speaker and when other patients asked questions, she could not locate the speaker or be close enough to read their lips. The background noises and acoustics in these environments interfered with her ability to use her hearing aid to understand most speech.

25.   For these settings, CART and advance copies of written hand-outs and power points were the only method of providing effective communication. CART services may be offered remotely or in-person.

26.   During the pandemic, remote CART services were available in the community.

27.   With remote CART services, lecturers and other attendees could wear their masks.

28.   Defendants did not furnish any auxiliary aid or service for large group lectures held in the auditorium, gym, or other large group setting to provide effective communication.

29.   Defendants delivered some of the behavioral health treatment in group therapy, involving groups of about 8 to 12 patients.

30.   A therapist led the group and communication jumped between the patients and the therapist.  Patients sat in a U-shape with the group therapist at the front of the room.

31.   During her stay, Plaintiff could not read lips during group therapy because patients and staff wore opaque masks.

32.   In group therapy, remote CART services or assistive technology that connected her Bluetooth technology to her hearing aid was necessary to provide effective communication during group therapy.

33.   Defendants did not provide any auxiliary aids and services during group therapy for effective communication.

34.   Infrequently, Defendants delivered Plaintiff's behavioral health services in a one-on-one sessions with a therapist or psychiatrist.

35.   In a one-on-one setting conducted in a quiet room with staff using clear, anti-fogging masks or lowering their mask at a social distance and trained to communicate in a manner that permits effective communication, Plaintiff could use lipreading and her hearing aid to communicate.

36.   Generally, Defendants' employees wore opaque masks in these one-on-one behavioral health sessions.  Defendants did not provide clear, anti-fogging masks for their staff or other patients to use and told Plaintiff that they could not require patients or staff to use clear masks.

37. At times, some therapists delivering one-on-one therapy or behavioral health service lowered their masks in these one-on-one setting.

38. Obtaining a clear, anti-fogging mask would have been an option for providing effective communication in one-on-one communications in quiet rooms with staff trained about how to communicate with people who use hearing aid(s) and read lips.

39. Defendants did not make reasonable modifications to allow for Plaintiff to be able read lips in these settings by using a different vendor to provide clear, anti-fogging masks. Defendants did not take necessary steps to train their staff about how to communicate effectively with patients that use lipreading and hearing aid(s).

40. After hearing Plaintiff's struggles, on March 3, 2021, Sierra Tucson therapist Cindy Liora who was assigned to provide therapy to Plaintiff, called Plaintiff's husband. Mr. Parsons also expressed his concerns that Sierra Tucson was not providing Plaintiff with the aids and accommodations she needed to be able to participate in treatment.

41. During the call, he made several suggestions, such as apps to use with Plaintiff's phone that Ms. Liora rejected. When Mr. Parsons suggested to Ms. Liora that there may be phone apps that could be used to improve amplification to Plaintiff's hearing aid, Ms. Liora stated that Sierra Tucson could not approve the use of phone apps to assist Plaintiff with hearing presenters, speakers and participants because of confidentiality concerns.

42. When Mr. Parsons suggested to Ms. Liora that Sierra Tucson hold sessions and activities outside so that speakers and participants could pull their masks down to communicate while observing safe practices during COVID-19 restrictions, Ms. Liora told him this could not be done because speakers used technology, such as PowerPoint presentations, and those could not be used outside. During the call, Ms. Liora offered no other options to provide effective communication for Plaintiff.

43. On or about March 3, 2021, Sierra Tucson agreed to write an order to allow Plaintiff access to use her cell phone during the day, which was not otherwise permitted except during quiet time in the lodge at night. The order was issued so Plaintiff could try to control

the volume of her hearing aid more easily and to pair her cell phone's Bluetooth technology with a downloadable app that might produce captions on her phone.

44.   On or about March 6, 2021, the order permitting Plaintiff to use her cell phone during behavioral health programming reached her medical staff and was implemented.

45.   Oticon ON is an app that pairs to her hearing aid and allows individuals to increase or decrease volume of the hearing aid using an iPhone.

46.   Plaintiff explored the Oticon ConnectLine to connect her hearing aid to different audio devices, such as a microphone that the speaker wears, and use it to select a volume that allowed her to capture as much speech as possible.  However, the Oticon ConnectLine did not work without other assistive technology, such as StreamerPro and an FM listening system, which Defendants did not possess.

47.   Plaintiff downloaded various voice-to-text apps to try and access captions on her phone.  However, the captioning service did not work in a group counseling setting because there was too much background noise and the group leader and participants were too far away for the app to pick up the speech and produce accurate captions. The individual speaking needed to be close to the phone for the voice to text to be accurate and work effectively. It did not work in a group setting because the group therapy leader and the participants would need to be holding Plaintiff's phone for the amplification to work. It was impractical to pass the phone around the entire room to keep up with the discussion and question and answers. Plaintiff tried placing her phone in the middle of the group, but it was too loud and too much background noise for the app to work.

48.   Plaintiff's group therapy leader was present in group when Plaintiff tried to use the voice-to-text apps to create captions.

49.   On or about March 8, 2021, Plaintiff spoke to Mr. Kerwin and Ms. Hixson-Weiss that these voice-to-text apps did not work in the group setting and that Oticon ON and ConnectLine required other technology, such as the StreamerPro and a listening system or microphones and table mics.

7

50.   On or about March 12, 2021, Mr. Parsons spoke with Sierra Tucson's Chief Quality and Risk Officer Sue Menzie and Associate Clinical Director of Trauma Services David Cato. Mr. Parsons discussed that Plaintiff was not able to participate in the behavioral health services at Sierra Tucson because the facility was not addressing her communication needs. He asked if they had inquired about the clear, anti-fogging mask that Plaintiff had ordered and provided to them as a sample.

51.   On March 14, 2021, Mr. Parsons filed an online complaint with Defendants' third-party compliance department about his concerns that Plaintiff was not receiving the same care as other Sierra Tucson patients.

52.   On March 15, 2021, Mr. Parsons exchanged emails with Ms. Menzie and Mr. Cato to follow up on Sierra Tucson's plan for providing effective communication.

53.   In the email exchange, Mr. Parsons asked Ms. Menzie if Sierra Tucson looked into ordering the clear full, anti-fogging masks rather than the clear mask with a small cut-out for the lips.  Ms. Menzie stated that they looked into it and the mask was not on the approved list of vendors that they could order from, especially since they concluded that they had a viable alternative.

54.   Mr. Parsons sent a reply email, informing Ms. Menzie and Mr. Cato that they do not have a viable alternative because he tried the same type of mask and it fogs up after a few words are spoken. Mr. Parsons asked if Sierra Tucson had looked into arranging CART services to provide Plaintiff with captioning. In response, he received a reply stating "be assured that we are continually looking for ways to meet your wife's needs."  However, Defendants provided no specific information about how they were meeting Plaintiff's communication access.

55.   On March 15, 2021, after receiving the unsatisfactory response from Ms. Menzie and Mr. Cato, Mr. Parsons emailed Sierra Tucson's Chief Executive Officer Valerie Kading about the lack of effective communication during Plaintiff's stay. Mr. Parsons told Ms. Kading that Plaintiff needed staff to use face shields or masks that do not fog up to read lips and CART services. In the email, Mr. Parsons provided Ms. Kading with a link

1    to a specific clear mask that did not fog up and was FDA approved, which Plaintiff had
2    ordered a sample and provided to Defendants.

3    56.   On March 16, 2021, Ms. Kading responded to Mr. Parsons saying she took his
4    concerns seriously and that they would follow up with Sue Menzie and also explore the
5    mask option Mr. Parsons and Plaintiff had presented.

6    57.   Neither Ms. Kading, Ms. Menzie, nor Mr. Cato or any other of Defendants'
7    employees contacted Mr. Parsons about his concerns about the lack of effective
8    communication.

9    58.   Mr. Parsons did not receive a response from the complaint he filed with Defendants'
10   third-party compliance during Plaintiff's stay.

11   59.   On March 23, 2021, Sierra Tucson discharged Plaintiff.  She required emergency
12   behavioral health and hospitalizations within one day of her discharge from Sierra Tucson.

13   60.   Throughout Plaintiff's inpatient stay with Defendants, until March 23, 2021,
14   Plaintiff repeatedly, consistently, and sometimes desperately, informed Defendants that it
15   was not providing her with effective communication, that she was not benefitting from
16   Defendants' behavioral healthcare services without effective communication, and that she
17   needed appropriate auxiliary aids and services to benefit from the behavioral healthcare.

18   61.   Plaintiff's husband Sean Parsons magnified and supplemented Plaintiff's requests
19   that she needed effective communication and did not have equal access to the behavioral
20   healthcare services.

21   62.   Defendants did not take necessary steps to provide auxiliary aids and services for
22   effective communication and was largely unresponsive to Plaintiff's repeated requests.

23   63.   During Plaintiff's admission, Defendants did not take necessary steps to ensure
24   effective communication, such as:

25       A. Provide her with information and notice about an effective communication
26          policy.

27       B. Assess her communication needs for the different types of healthcare
28          communications occurring as part of the behavioral health treatment.

9

C.  Substantively respond to Plaintiff and Mr. Parson's suggestions and alternatives for providing effective communication.

D.  Provide her with remote CART services or equipment for assistive listening devices or systems.

E.  Consider how COVID 19 practices requiring the use of masks affected her ability to communicate as a patient relying, in part, on lipreading to communicate and obtain appropriate clear, anti-fogging masks for clinical staff and patients,

F.  Adequately train their clinical and compliance staff to ensure that they addressed communication access and resolved problems with communication access, and

G.  Develop an effective communication access plan during her 34-day stay.

64.  During her inpatient stay, Plaintiff could not meaningfully participate in the healthcare recovery programs and activities, such as cognitive/dialectical behavior group therapy classes, EMDR, and individual therapy.

65.  As a result of Defendants' failure to furnish auxiliary aids and services and provide reasonable modifications to ensure that Plaintiff had effective communication during her stay, Plaintiff received inferior and unequal behavioral health services, was forced into higher, more restrictive levels of care throughout her stay, experienced frustration, anxiety, and stress due to the lack of effective communication, and incurred expenses for behavioral healthcare services that were rendered inferior and ineffective without auxiliary aids and services.

66.  Within a few days of being discharged from Sierra Tucson, Plaintiff required additional emergency and in-patient behavioral health care.

## COUNT I

### Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 704

67.  Plaintiff incorporates by reference paragraphs 1 through 66 from the above.

68.   Upon information and belief, at all relevant times, Defendants received federal financial assistance in the form of reimbursement from the federal Medicare and Medicaid programs and the Provider Relief Fund is therefore subject to the anti-discrimination provisions of the Rehabilitation Act, as herein described.

69.   At all times relevant herein, there was in full force and effect a statute known as the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et sequitur*, and its implementing regulations, 45 C.F.R. § 84.4(a). The Section 504 implementing regulation provides that "[n]o qualified handicapped person shall, on the basis of handicap be excluded from participation in, be denied the benefits of or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance." 45 C.F.R. § 84.4(a).

A.   The regulation further provides:

"A recipient, in providing any aid, benefit, or service, may not, ... on the basis of handicap: (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others ..." 45 C.F.R. § 84.4(b)(1)(ii).

B.   Elsewhere, the Section 504 regulation states:

"In providing health, welfare or other social services or benefits, a recipient may not on the basis of handicap: … (2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered non-handicapped persons. 45 C.F.R. § 84.52(a)(2).

C.   In addition, "[a] recipient hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R.  § 84.52(c).

D.   The regulation further provides:

"A recipient to which the subject applies that employs 15 or more persons shall provide appropriate auxiliary aids to persons with

impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R. § 84.52(d)(l).

E. The regulation provides that such "auxiliary aids may include interpreters… and other aids for persons with impaired hearing… 45 C.F.R. § 84.52(d)(3).

F. The Section 504 regulation defines a person who has a disability as any person who:

"(i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 45 C.F.R. § 84.3(j)(l)(i)-(iii).

G. A qualified person with a disability, with respect to the provision of health, welfare and social services, is a person "who meets the essential eligibility requirements for the receipt of such services." 45 C.F.R. § 84.3(k)(4).

70.  Through the acts and omissions alleged herein, Defendants has, solely on the basis of Plaintiff's disability, excluded Plaintiff from participating in its services, denied Plaintiff the benefit of its services, denied Plaintiff the opportunity to participate in her own healthcare, and subjected Plaintiff to discrimination in violation of 29 U.S.C. § 794. *et seq.*, and the regulations promulgated thereunder, and have resulted in injury to Plaintiff.

71.  Knowing that Plaintiff requested and required clear masks for lipreading and CART services to achieve effective communication with doctors and staff, Defendants' acts and omissions alleged herein violated the Rehabilitation Act and its implementing regulations in one or more or all of the following manners:

A. Defendants intentionally and deliberately discriminated against Plaintiff by denying her the opportunity for the full and equal enjoyment of its programs, services and activities.

B. Defendants intentionally and deliberately discriminated against Plaintiff by denying her the opportunity to participate in or benefit from its programs, services and activities.

C. Defendants intentionally and deliberately discriminated against Plaintiff by offering or affording her services that are not equal to those services afforded to other individuals without hearing impairments.

D. Defendants intentionally and deliberately discriminated against Plaintiff by failing to make reasonable modifications in policies, practices, or procedures.

E. Defendants intentionally and deliberately discriminated against Plaintiff by failing to establish a procedure for effective communication with Plaintiff for the purpose of providing health care.

F. Defendants intentionally discriminated against Plaintiff by deliberately failing to provide Plaintiff with appropriate auxiliary aids and services, such as an on-site sign language interpreter or effective video remote interpreting services, despite knowing the failure to do so would likely result in harm to the Plaintiff's federally protected rights and failed to act upon that likelihood.

G. Defendants has otherwise discriminated against Plaintiff.

72. Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

73. As a proximate result of Defendants' violations of Section 504, Defendants have inflicted injury and damages upon Plaintiff, including loss of a civil right, mental anguish, humiliation, and mental pain and suffering.

74. Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794(a), as Defendants' conduct has inflicted

injury and damages upon Plaintiff, including loss of a civil right, mental anguish, and mental pain and suffering.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A. An order enjoining Defendants from discriminating against Plaintiff, requiring Defendants to (i) adopt and implement a legally compliant communication access policy; (ii) make available to Plaintiff an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are hard of hearing;

B. An award of compensatory monetary damages;

C. An award of attorneys' fees and costs; and

D. Such other relief as the Court deems just.

## COUNT II

**Violation of Section 1557 of the Patient Protection and Affordable Care Act,**

**42 U.S.C. § 18116 et seq**

75. Plaintiff incorporates by reference paragraphs 1 through 74 from above.

76. Since March 2010, there was in full force and effect a statute known as the Patient Protection and Affordable Care Act (the "Affordable Care Act"), 42 U.S.C. § 18001, *et seq.,* Pub.L. 111-148. Section 1557 of the Affordable Care Act prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities. 42 U.S.C. § 18116. Section 1557's implementing regulations, 45 C.F.R. §§ 92.1 – 92.203, effective as of July 18, 2016, apply to health programs or activities administered by recipients of Federal financial assistance from the Department of Health and Human Services.

77. Based upon information and belief, as Defendant Acadia Healthcare participates in Medicare and Medicaid and the Provider Relief Fund funding from the Department, it is a covered entity subject to compliance with Section 1557.

78. The implementing regulations of Section 1557 prohibit discrimination of an individual on the basis of disability, *inter alia*, and prohibit an individual from being excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination under any health program or activity. *See* 45 C.F.R. § 92.101(a)(1). Those regulations, in pertinent part, require covered entities to:

A.   Take appropriate initial and continuing steps to notify beneficiaries, enrollees, applicants and members of the public:

(1)   that the covered entity does not discriminate on the basis of race, color, national origin, sex, age, or disability in its healthcare programs or activities. 45 C.F.R. §92.8 (a)(1);

(2)   that the covered entity provides appropriate auxiliary aids and services, including qualified interpreters for individuals with disabilities and information in alternate formats, free of charge and in a timely manner, when such aids and services are necessary to ensure an equal opportunity to participate to individuals with disabilities. 45 C.F.R. §92.8 (a)(2);

(3)   how to obtain aids and services. 45 C.F.R. §92.8 (a)(4);

(4)   the identification of, and contact information for, the responsible employee designated to be responsible for adoption of grievance procedures. 45 C.F.R. §92.8 (a)(5);

(5)   the availability of grievance procedures and how to file a grievance pursuant to §92.7(b). 45 C.F.R. §92.8 (a)(6); and

(6)   how to file a discrimination complaint with the Department of Health and Human Services Office of Civil Rights. 45 C.F.R. §92.8 (a)(7).

B.   That a covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities, in accordance

1          with the standards found at 28 C.F.R. §§ 35.160 through 35.164. 45 C.F.R. §

2          92.202(a).

3    79.  28 C.F.R.  §§ 35.160 through 35.164 are the communication access standards

4 required of public entities under Title II of the ADA. As applied to Section 1557 covered

5 entities, the Title II regulations require them to "take appropriate steps to ensure that

6 communications with applicants, participants, members of the public, and companions

7 with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

8 In addition, a covered entity "shall furnish appropriate auxiliary aids and services where

9 necessary to afford qualified individuals with disabilities, … companions, … an equal

10 opportunity to participate in, and enjoy the benefits of, a service, program or activity of a

11 [covered] entity," 28 C.F.R. § 35.160(b)(1); and "[i]n determining what types of auxiliary

12 aids and services are necessary, a [covered] entity shall give *primary consideration* to the

13 requests of individuals with disabilities …." 28 C.F.R. § 35.160(b)(2) (emphasis added).

14          Defendants had a duty under Section 1557 to give primary consideration to

15          Plaintiff's communication preference and provide her with clear masks for

16          lipreading and CART services.

17    80.  Defendants' acts and omissions violated Section 1557 and its implementing

18 regulations as Defendants did not take appropriate steps to ensure that communications

19 with Plaintiff were as effective as communications with others in its healthcare services,

20 and Defendants failed to meet what Defendants was legally required to do under Section

21 1557 and the standards found at 28 C.F.R. §§ 35.160 through 35.164. 45 C.F.R. §

22 92.202(a).

23    81.  Section 1557's implementing regulations provide that the enforcement mechanisms

24 available for and provided under Title VI of the Civil Rights Act of 1964, Section 504 of

25 the Rehabilitation Act, *inter alia*, shall be available for purposes of Section 1557 as

26 implemented by this part, and "compensatory damages for violations of Section 1557 are

27 available in appropriate administrative and judicial actions brought under this rule." *See* 45

28 C.F.R. § 92.301.

82. Defendants' conduct constituted violations of Section 1557.

83. Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

84. Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.   An order enjoining Defendants from discriminating against Plaintiff, requiring Defendants to (i) adopt and implement a legally compliant communication access policy; (ii) make available to Plaintiff an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are hard of hearing;

B.   An award of compensatory monetary damages;

C.   An award of attorneys' fees and costs; and

D.   Such other relief as the Court deems just.

## COUNT III

### Violation of the Arizonans with Disabilities Act, A.R.S. § 41-1492

85. Plaintiff incorporates by reference paragraphs 1 through 84.

86. Plaintiff's claims in Count III arise under the Arizonans with Disabilities Act, A.R.S. §§ 41-1492 (the "AzDA"), and its implementing administrative rules under Ariz. Admin. Code §§ R-10-3-401 – R-10-3-412.

87. Plaintiff is a person with a disability as that term is defined and interpreted by AzDA. A.R.S § 41-1492 defines disability as a "physical or mental impairment that

substantially limits one or more major life activities." Under § 41-1492.12, the determination of whether an individual's impairment is substantially limited is determined without benefit of mitigating measures, such as hearing aids.

88.   Defendants are healthcare providers covered under A.R.S. § 41-1492(11)(f), public accommodations, include "any . . . professional office of a health care provider, hospital or other service establishment."

89.   AzDA defines discrimination by public accommodations to include "[a] failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of reasonable modifications in policies, practices or procedures or auxiliary aids and services, unless the entity can demonstrate that taking these steps would fundamentally alter the nature of the goods, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden. A.R.S. § 41-1492.02(G)(3); *see also Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 904–05 (9th Cir. 2019) (Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations" to people with disabilities, 42 U.S.C. § 12182(a), and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services").

90.   Auxiliary aids and services include but are not limited to computer–aided transcription services, closed captions, and written materials as well as listening devices. A.A.C. R10-3-404 (incorporating the requirements of 28 C.F.R. § 36.303(b)).

91.   Public accommodation "should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication," and the public accommodation itself is independently responsible for making the "ultimate decision as to what measures to take." A.A.C R10-3-404

1  (incorporating 28 C.F.R. § 36.303(c)(1)(ii)). However, the measures that are taken must

2  provide effective communication.

3      92.   The type of auxiliary aid and service necessary to ensure effective communication

4  will vary in accordance with the nature of the individual's disability, the method of

5  communication used by the individual as well as the nature, length and complexity of the

6  communication involved and the context in which a communication is taken place.

7  However, in determining what types of auxiliary aids and services are necessary, a public

8  accommodation must take reasonable steps to make the individual's experience less

9  onerous and more akin to that enjoyed by non-disabled patients. *See cf. Baughman v. Walt*

10  *Disney World Co.,* 685 F.3d 1131, 1136 (9th Cir. 2012) (ADA Title III case involving

11  reasonable modifications of policies, practices and procedures).

12      93.   The acts and omissions of Defendants violated and continue to violate the AzDA

13  and its implementing rules in one or more or all of the following manners, as Defendants

14  has discriminated against Plaintiff by:

15              A.   Denying her the opportunity for the full and equal enjoyment of

16                   Defendants' services, programs and activities.

17              B.   Denying her the opportunity to participate in or benefit from

18                   Defendants' services, programs and activities.

19              C.   Offering or affording her services that are not equal to those services

20                   afforded to other individuals who are not hard of hearing.

21              D.   Failing to make reasonable modifications in policies, practices, or

22                   procedures, which are necessary to afford Defendants' services,

23                   programs and activities to Plaintiff.

24              E.   Intentionally failing to provide Plaintiff with appropriate auxiliary

25                   aids and services to achieve effective communications and to

26                   participate in her own healthcare.

27              F.   Failing to train staff about its obligations to provide auxiliary aids and

28                   services.

G.    Otherwise having discriminated against the plaintiff because of her disability, including treating her as a "reactive" and non-compliant when she opposed unlawful practices of failing to provide effective communication.

94.   As a proximate result of Defendants' violations of the AzDA, Defendants have inflicted injury and damages upon the Plaintiff, including loss of a civil right, mental anguish, humiliation, and mental pain and suffering.

95.   Defendants' conduct constitutes ongoing and continuing violations of the AzDA. Unless restrained from doing so, Defendants will continue to violate the AzDA.

96.   Plaintiff is entitled to reasonable attorney's fees as part of the costs, pursuant to A.R.S. § 41-1492.09(F).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A.    An order enjoining Defendants from discriminating against Plaintiff, requiring Defendants to (i) adopt and implement a legally compliant communication access policy; (ii) make available to Plaintiff an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are hard of hearing;

B.    An award of compensatory money damages, including out of pocket expenses and emotional distress damages.

C.    An award of attorneys' fees and costs;

D.    Such other relief as the Court deems just.

**Plaintiff Demands Trial by Jury**.

Dated: February 16, 2023

By: *Christine Parsons*
Christine Parsons

1

2  Christine Parsons
   1551 Spring Water Place
3  Highland Ranch, CO 80129
   christine.parsons@live.com
4  (720) 341-7546

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A-1



# EXHIBIT A-2



# EXHIBIT B

 

Home   About   Interpreting   CART   Community   DeafBlind   Events   Videos   Donate

CART Services



# REQUEST A CART PROVIDER ON-LINE

### Request CART Professional Now

  CART requests requires at least a 48-hours advance notice.  

## Communication Access
## Real-time Translation (CART)

Communication access real-time translation (CART), also called real-time captioning, is the general name of the system that a CART professional converts speech to text. A trained professional uses keyboard or stenography methods to transcribe spoken speech into written text. CART professionals have qualifications for added expertise (speed and accuracy) as compared to court reporters and other stenographers.

Display options include computers, projection screens, monitors or mobile devices. The real-time text may be displayed as a full screen of large text at the front of the room or the text may be incorporated onto the same screen as a PowerPoint presentation.

It is also useful for deaf people whose first language (American Sign Language) is different from the language being used in the meetings (English), or hard of hearing people to understand speakers with different voices and accents in many group situations (at work, in education, community events), to have a "transcript", and for learning languages. After the event, transcripts will be provided for free. And customers find this extremely useful.

### On-site CART



### Remote CART



On-site CART is provided on-site at local meetings, classes, training sessions and special events. A provider will bring equipment to the site and set it up. Customers may have to provide projectors and screens. How does it work?  1) The speaker voices the content information, 2) the voiced content information is then transmitted to a CART professional, who then 3) transcribes the voiced content into textual English for the Deaf/HH individual to access the content.

Remote CART  is exactly the same as on-site CART except the provider is in a remote location.  A voice connection such as a telephone, cellphone, or computer microphone is used to send the voice to the operator, and the real-time text is transmitted back over a modem, Internet, or other data connection. This is the most common used method. The process works that same as the On-site CART, with the only exception is that the CART Professional is located remotely.

Request CART Professional Now



**ABOUT**

Mission
Board
Staff
Careers
Donate
eNews

25 E. Frisco Avenue, St. Louis, MO 63119

**SERVICES**

Interpreting
CART
Community
DeafBlind
ASL Classes

**OTHERS**

Pink Wings of Hope
Rustic Lantern Films

**CONTACT INFO**

FRONT DESK
Phone/VP: (314) 714-6400
FAX: (314) 266-7427
Secure online contact

INTERPRETING SERVICES
Phone: (314) 968-8868
Toll Free: (888) 898-3323
Secure online contact

    

    

Copyright DEAF Inc. 2008-2018  |  Privacy Policy  |  Terms & Conditions

 

### *Pima County Clerk of Superior Court*
### *Tucson, Arizona*

|  |  |
|---|---|
|  | Receipt Number:   3585986 |

| | | | |
|---|---|---|---|
| Received for: | Christine Parsons | Date: | 2/17/2023 |
| Received from: | Christine Parsons | Case Number: | C20230734 |
| Amount Received: | $258.00 | Clerk Number: | 1,738 |

Caption:          CHRISTINE PARSONS VS. ACADIA HEALTHCARE COMPANY, INC., SIERRA TUCSON LLC ANI

Cash: $0.00              Check:  $0.00              Charge: $0.00              ACH: $258.00

*Begin Financial Docket*

Civil Complaint                                          $258.00     PAID

*End Financial Docke*

Change Returned:   $0.00

Amount Refunded:  $0.00

FILED
Gary Harrison
CLERK, SUPERIOR COURT
5/10/2023 4:11:17 PM
BY: ALAN WALKER /s/
DEPUTY
C20230734
HON. GARY J. COHEN

1   William A. Richards #013381
**RICHARDS & MOSKOWITZ PLC**
2   1850 North Central Avenue, Suite 2010
Phoenix, Arizona 85004
3   Telephone No. 602-595-7800
Facsimile No. 602-595-7800
4   E-mail:  brichards@RMazlaw.com

5   Rose Daly-Rooney  (Arizona Bar No. 015690)
**ARIZONA CENTER FOR DISABILITY LAW**
6   177 North Church Avenue, Suite 800
Tucson, Arizona 85701
7   Telephone:   (520) 327-9547
Facsimile:    (520) 884-0992
8   E-mail:      rdalyrooney@azdisabilitylaw.org

9   Andrew Rozynski (Pro Hac Vice to be Filed)
**EISENBERG & BAUM, LLP**
10   24 Union Square East, Penthouse
New York, NY 10003
11   Telephone No. 212-353-8700
Facsimile No. 212-353-1708
12   E-mail: arozynski@EandBLaw.com
13   *Attorneys for Plaintiffs*

HON. GARY J. COHEN

14

15   **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

16   **IN AND FOR THE COUNTY OF PIMA**

17   Christine Parsons,     Case Number:  C20230734

18

19         Plaintiff,

20   v.     **CERTIFICATE OF COMPULSORY ARBITRATION**

21

22   Acadia Healthcare Company, Inc., Sierra Tucson LLC and Sierra Tucson, Inc.

23         Defendants.

24

25      The undersigned certifies that he or she knows the dollar limits and any other limitations

26   set forth by the local rules of practice for the applicable superior court and further certifies that

27   because Plaintiff is seeking injunctive relief in addition to compensatory monetary relief, this

28   action is <u>not</u> subject to compulsory arbitration, as provided in Rules 72 through 77 of the Arizona

Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this 10th day of May, 2023.

**RICHARDS & MOSKOWITZ PLC**


*/s/ William A. Richards*
William A. Richards
1850 N. Central Avenue, Suite 2010
Phoenix, AZ 85004

Arizona Center for Disability Law
Rose A. Daly-Rooney
177 North Church Avenue, Suite 800
Tucson, Arizona 85710

AND

EISENBERG & BAUM, LLP
Andrew Rozynski
24 Union Square East, Penthouse
New York, NY 10003

*Attorneys for Plaintiff*

Person/Attorney Filing: WILLIAM A. RICHARDS
Mailing Address: 1850 N Central Avenue Suite 2010
City, State, Zip Code: Phoenix, AZ 85004
Phone Number: (602)595-7800
E-Mail Address: brichards@rmazlaw.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 013381, Issuing State: AZ

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF PIMA

CHRISTINE PARSONS
Plaintiff(s),
v.
ACADIA HEALTHCARE COMPANY, INC.,
SIERRA TUCSON LLC AND SIERRA
TUCSON, INC.
Defendant(s).

Case No.      C20230734

**SUMMONS**

HON. GARY J. COHEN

To: Sierra Tucson Inc.

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1.  A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2.  If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 110 West Congress Street, Tucson, Arizona 85701 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
    Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
    Note: If you do not file electronically you will not have electronic access to the documents in this case.

3.  If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

AZturboCourt.gov Form Set #7977104

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  PIMA



SIGNED AND SEALED This Date: 5/9/2023

Gary Harrison
Clerk of the Superior Court

BY:   ALAN WALKER /s/
          Deputy Clerk

Person/Attorney Filing: WILLIAM A. RICHARDS
Mailing Address: 1850 N Central Avenue Suite 2010
City, State, Zip Code: Phoenix, AZ 85004
Phone Number: (602)595-7800
E-Mail Address: brichards@rmazlaw.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 013381, Issuing State: AZ

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF PIMA

| | |
|---|---|
| CHRISTINE PARSONS<br>Plaintiff(s),<br>v.<br>ACADIA HEALTHCARE COMPANY, INC.,<br>SIERRA TUCSON LLC AND SIERRA<br>TUCSON, INC.<br>Defendant(s). | Case No.    C20230734<br><br>**SUMMONS**<br><br>HON. GARY J. COHEN |

To: Sierra Tucson LLC

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 110 West Congress Street, Tucson, Arizona 85701 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
Note: If you do not file electronically you will not have electronic access to the documents in this case.

3. If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  PIMA



SIGNED AND SEALED This Date: 5/9/2023

Gary Harrison
Clerk of the Superior Court

BY:    ALAN WALKER /s/
                Deputy Clerk

AZturboCourt.gov Form Set #7977104

2

Person/Attorney Filing:  Christine Parsons
Mailing Address:  1551 Spring Water Place
City, State, Zip Code:  Highlands Ranch CO 80129
Phone Number:  720-341-7546
E-Mail Address:  christine.parsons@live.com
[☒] Representing Self, Without an Attorney
(If Attorney) State Bar Number:

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF Pima

Christine Parsons
Plaintiff(s),

v.                                                    Case No. C20230734

Acadia Healthcare Company, Inc., Sierra Tucson
LLC and Sierra Tucson, Inc.                  **SUMMONS**
Defendant(s).

HON. GARY J. COHEN

To:  Acadia Healthcare Company, Inc., Sierra Tucson LLC and Sierra Tucson, Inc.

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT
AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO
NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1.  A lawsuit has been filed against you. A copy of the lawsuit and other court papers were
    served on you with this Summons.

2.  If you do not want a judgment taken against you without your input, you must file an
    Answer in writing with the Court, and you must pay the required filing fee. To file your
    Answer, take or send the papers to Clerk of the Superior Court, 110 W Congress St Tucson
    AZ 85701 or electronically file your Answer through one of Arizona's approved electronic
    filing systems at http://www.azcourts.gov/efilinginformation.
    Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top
    of this Summons.
    Note: If you do not file electronically you will not have electronic access to the documents
    in this case.

3.  If this Summons and the other court papers were served on you within the State of
    Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the
    date of service, not counting the day of service. If this Summons and the other court papers
    were served on you outside the State of Arizona, your Answer must be filed within
    THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of
    service.

    Requests for reasonable accommodation for persons with disabilities must be made to

the court by parties at least 3 working days in advance of a scheduled court proceeding.

     GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of <u>Pima</u>



SIGNED AND SEALED This Date: 2/17/2023

Gary Harrison
Clerk of the Superior Court

BY:   ALAN WALKER  /s/
          Deputy Clerk

2

Person/Attorney Filing: WILLIAM A. RICHARDS
Mailing Address: 1850 N Central Avenue Suite 2010
City, State, Zip Code: Phoenix, AZ 85004
Phone Number: (602)595-7800
E-Mail Address: brichards@rmazlaw.com
[ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 013381, Issuing State: AZ

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF PIMA

CHRISTINE PARSONS
Plaintiff(s),
v.
ACADIA HEALTHCARE COMPANY, INC.,
SIERRA TUCSON LLC AND SIERRA
TUCSON, INC.
Defendant(s).

Case No.     C20230734

**SUMMONS**

HON. GARY J. COHEN

To: Acadia Healthcare Company, Inc.

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 110 West Congress Street, Tucson, Arizona 85701 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
Note: If you do not file electronically you will not have electronic access to the documents in this case.

3. If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  PIMA



SIGNED AND SEALED This Date: 5/9/2023

Gary Harrison
Clerk of the Superior Court

BY:     ALAN WALKER /s/
            Deputy Clerk

2

FILED
Gary Harrison
CLERK, SUPERIOR COURT
2/16/2023 6:52:46 PM
BY: ALAN WALKER  /s/
DEPUTY

# In the Superior Court of the State of Arizona
# In and For the County of <u>Pima</u>

**Plaintiff's Attorney**:
Bar Number:
Email address:

C20230734

**Plaintiffs**

Christine Parsons 1551 Spring Water Pl Highlands Ranch CO 80129

**Defendants**

Acadia Healthcare Company, Inc., Sierra Tucson LLC and Sierra Tucson Inc.    HON. GARY J. COHEN

Discovery Tier Level: <u>Tier 3</u>
Amount claimed: <u>_____</u>

Case Category:  <u>Unclassified Civil</u>
Case Subcategory: <u>Other</u>

Emergency Type:
Commercial Court: <u>No</u>
Is an Interpreter Needed: <u>Yes</u>  If Yes Specify Language: <u>ENGLISH</u>

FILED
GARY L. HARRISON
CLERK, SUPERIOR COURT

23 APR 24 PM 12: 19

SANDRA RAY DEPUTY



**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF PIMA**

CHRISTINE PARSONS VS. ACADIA HEALTHCARE COMPANY, INC., SIERRA TUCSON LLC AND SIERRA TUCSON, INC.

Case:   C20230734
Date:   4/21/2023

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NOTICE RE: IMPENDING DISMISSAL

It appearing that service of summons and complaint has not been made upon the defendant(s) listed below,

YOU ARE HEREBY NOTIFIED THAT the action will be dismissed without prejudice AS TO THE DEFENDANT(S) LISTED BELOW without further notice after 30 days from the date of this notice, unless good cause is shown why service was not made within the time limits established by Rule 4, Arizona Rules of Civil Procedure, and that additional time should be granted within which to accomplish service.

If you have reason to believe this notice has been issued in error please call
**Case Management Services, Dismissal Desk, at 520-724-3551.**

BY:   Andrea Borbon-Robles
                    Case Management Services

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PLAINTIFF                         **VS**          DEFENDANT

PARSONS, CHRISTINE                                ACADIA HEALTHCARE COMPANY, INC., SIERRA
                                                 TUCSON LLC AND SIERRA TUCSON, INC.

cc:   CHRISTINE PARSONS

FILED
Gary Harrison
CLERK, SUPERIOR COURT
5/9/2023 11:45:40 AM
BY: ALAN WALKER /s/
DEPUTY
C20230734
HON. GARY J. COHEN

William A. Richards #013381
**RICHARDS & MOSKOWITZ PLC**
1850 North Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone No. 602-595-7800
Facsimile No. 602-595-7800
E-mail:  brichards@RMazlaw.com

Rose Daly-Rooney  (Arizona Bar No. 015690)
ARIZONA CENTER FOR DISABILITY LAW
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:   (520) 327-9547
Facsimile:   (520) 884-0992
E-mail:      rdalyrooney@azdisabilitylaw.org

HON. GARY J. COHEN

Andrew Rozynski (Pro Hac Vice to be Filed)
**EISENBERG & BAUM, LLP**
24 Union Square East, Penthouse
New York, NY 10003
Telephone No. 212-353-8700
Facsimile No. 212-353-1708
E-mail: arozynski@EandBLaw.com
*Attorneys for Plaintiffs*

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

# IN AND FOR THE COUNTY OF PIMA

| | |
|---|---|
| Christine Parsons,<br><br>                    Plaintiff,<br><br>v.<br><br>Acadia Healthcare Company, Inc., Sierra Tucson LLC and Sierra Tucson, Inc.<br><br>                    Defendants. | Case Number:  C20230734<br><br><br>**FIRST AMENDED COMPLAINT**<br><br>**Jury Trial Demand** |

1

Plaintiff Christine Parsons, for her Complaint against Defendants Acadia Healthcare dba Sierra Tucson, LLC., ("Defendants"), states as follows:

## PARTIES

1.   Plaintiff Christine Parsons ("Plaintiff"), is a 36-year-old female, and is hard of hearing in both ears. She is a resident of Colorado who received behavioral health treatment in Acadia Healthcare's Sierra Tucson facility in Tucson, Arizona from February 17, 2021 through March 23, 2021.

2.   Defendant Acadia Healthcare Company, Inc., is a provider of behavioral healthcare services. Acadia operates a network 246 behavioral healthcare facilities with approximately 10,800 beds in 39 states, including Arizona, and Puerto Rico. Acadia provides behavioral healthcare and substance use services to its patients in a variety of settings, including inpatient psychiatric hospitals, specialty treatment facilities, residential treatment centers and outpatient clinics. Defendant Acadia Healthcare Company, Inc. owns and operates the Sierra Tucson facility in Tucson, Arizona.

3.   Sierra Tucson provided inpatient and outpatient services including the various types of specific recovery programs, including a Mood & Anxiety Program that treats various Mood Disorders.

4.   Sierra Tucson, Inc., a foreign corporation, and Sierra Tucson LLC, an Arizona Corporation, also own and operate the Sierra Tucson facility.

## JURISDICTION AND VENUE

5.   This Court has jurisdiction over Plaintiff's claims alleged here because the value of this case exceeds $10,000 dollars.

6.   Venue is proper in Pima County under A.R.S. § 12-401 because Defendant operates its Sierra Tucson facility in Pima County, and all of the events or omissions giving rise to Plaintiff's claims occurred in Pima County.

7.   Pursuant to Arizona Rules of Civil Procedure, Rules 26.2(c)(3), the Court should assign this case to Tier 3.

## **FACTUAL ALLEGATIONS**

8.   Plaintiff has a BTE Oticon hearing aid in her right ear and reads lips. The hearing aid amplifies sound but does not restore hearing within normal limits. The hearing aid can be used with her iPhone's Bluetooth features to connect to a TV or phone.

9.   Due to the inherent limitations of lipreading, she cannot make out most of the aural information that is presented during important healthcare communications, such as group and individual therapy, lectures, and consultations. It is not possible for people who lipread to consistently understand everything that is said by lipreading alone. Common difficulties associated with lipreading include but are not limited to: normal speech is too fast to lipread easily, many sounds are not seen on the lips, many speech patterns look similar on the lips, and many sounds look alike, even though they are different.

10.   There are many factors outside of Plaintiff's control that reduce the effectiveness of lipreading because many people, including that healthcare professionals and other patients may not speak clearly, have facial hair or accents that interferes with lipreading, cover parts of their mouth when speaking, and not look directly at the person who is lipreading.

11.   In any group therapy, large group setting, consultation, or other communication involving more than one speaker, the ability to read lips is decreased because aural information is lost when the speaker changes without time or cues for the lipreader to follow.

12.   Lipreading is hard work and takes a lot of energy, which may be impacted for patients in a behavioral health care crisis on specific medications that may produce side effects that interfere with attention and concentration or produce fatigue or sleepiness. This means that important healthcare communications require auxiliary aids and services.

13.   Plaintiff's husband Sean Parsons, contacted Sierra Tucson for information about their services and programs when Plaintiff required an inpatient behavioral health stay. There are no inpatient behavioral health residential treatment centers in Colorado and Plaintiff preferred to go to Tucson, Arizona because she had a brother-in-law living in Tucson.

14.   During the week of February 8, 2021, Mr. Parsons had several phone calls and online chats

2

using Sierra Tucson's chat function with Admissions Coordinator Steven Goldsmith to learn more about the program.

15.   During their contacts, Mr. Parsons told Mr. Goldsmith that Plaintiff has severe hearing loss, uses one hearing aid, and uses lipreading. Mr. Goldsmith described the Sierra Tucson behavioral health therapy services as being primarily one-on-one services with some small groups. Based on this information, Mr. Parsons and his wife selected Sierra Tucson.

16.   Plaintiff was admitted to Sierra Tucson on February 17, 2021 for an inpatient stay at Sierra Tucson in the facility's Anxiety and Mood Disorder Program.

17.   During Plaintiff's stay at Sierra Tucson, patients and staff were required to wear masks and patients and staff used opaque masks that prevented Plaintiff from lipreading.

18.   On her first day at Sierra Tucson, Plaintiff informed all staff that she encountered, including nursing staff, that she was hard of hearing and could not understand clearly what the staff was saying with their masks.

19.   During the hospitalization, Sierra Tucson's COVID-19 protocol required staff and patients to always wear a facemask.  The facemasks used were opaque, making it impossible for Plaintiff to read lips to aid in her communication.

20.   Plaintiff asked Sierra Tucson facility staff to take steps to provide effective communication because she could not read lips when staff and other patients were using opaque masks.

21.   After two days, Sierra Tucson transferred Plaintiff from their locked hospital setting to their unlocked residential treatment campus.  When Plaintiff met with the head nurse and notified her that she needed accommodations for her disability, Plaintiff told her that no one was doing anything to accommodate her communication needs. This nurse, immediately wrote an email to get this solved but the email did not produce any change in her circumstances.

22. From February 17, 2021 to March 19, 2021, Defendants did not assess Plaintiff's communication needs, develop an effective communication access plan, provide auxiliary aids or services, such as Communication Access Realtime Translation (CART) or provide assistive technology to connect the Bluetooth technology of her hearing aid to microphones worn by group

therapists or lecturers, or provide clear, anti-fogging masks as a reasonable modification to provide effective communication. *See* Exhibit A-1, an image of a clear, anti-fogging mask and A-2, an image of the type of mask with a clear cut-out that fogs.

23. CART transcribes and translates spoken text and sound into words. The text appears in real-time — while the words are spoken or played — on a big screen that everyone can see, on a laptop, or on a mobile device. *See* Exhibit B, an image from Deaf, Inc.'s website showing how CART works.

24. Defendants delivered most of the behavioral health services in lecture style in a gym, large cafeteria, or other large meeting room. Often about 30-40 patients attended the lectures. The lectures allowed for patients to ask questions.

25. Plaintiff could not read lips at all in these settings because she was not close enough to the speaker and when other patients asked questions, she could not locate the speaker or be close enough to read their lips. The background noises and acoustics in these environments interfered with her ability to use her hearing aid to understand most speech.

26. For these settings, CART and advance copies of written hand-outs and power points were the only method of providing effective communication. CART services may be offered remotely or in-person.

27. During the pandemic, remote CART services were available in the community.

28. With remote CART services, lecturers and other attendees could wear their masks.

29. Defendants did not furnish any auxiliary aid or service for large group lectures held in the auditorium, gym, or other large group setting to provide effective communication.

30. Defendants delivered some of the behavioral health treatment in group therapy, involving groups of about 8 to 12 patients.

31. A therapist led the group and communication jumped between the patients and the therapist. Patients sat in a U-shape with the group therapist at the front of the room.

32. During her stay, Plaintiff could not read lips during group therapy because patients and staff wore opaque masks.

33.   In group therapy, remote CART services or assistive technology that connected her Bluetooth technology to her hearing aid was necessary to provide effective communication during group therapy.

34.   Defendants did not provide any auxiliary aids and services during group therapy for effective communication.

35.   Infrequently, Defendants delivered Plaintiff's behavioral health services in a one-on-one sessions with a therapist or psychiatrist.

36.   In a one-on-one setting conducted in a quiet room with staff using clear, anti-fogging masks or lowering their mask at a social distance and trained to communicate in a manner that permits effective communication, Plaintiff could use lipreading and her hearing aid to communicate.

37.   Generally, Defendants' employees wore opaque masks in these one-on-one behavioral health sessions.  Defendants did not provide clear, anti-fogging masks for their staff or other patients to use and told Plaintiff that they could not require patients or staff to use clear masks.

38.   At times, some therapists delivering one-on-one therapy or behavioral health service lowered their masks in these one-on-one setting.

39.   Obtaining a clear, anti-fogging mask would have been an option for providing effective communication in one-on-one communications in quiet rooms with staff trained about how to communicate with people who use hearing aid(s) and read lips.

40.   Defendants did not make reasonable modifications to allow for Plaintiff to be able read lips in these settings by using a different vendor to provide clear, anti-fogging masks. Defendants did not take necessary steps to train their staff about how to communicate effectively with patients that use lipreading and hearing aid(s).

41.   After hearing Plaintiff's struggles, on March 3, 2021, Sierra Tucson therapist Cindy Liora who was assigned to provide therapy to Plaintiff, called Plaintiff's husband. Mr. Parsons also expressed his concerns that Sierra Tucson was not providing Plaintiff with the aids and accommodations she needed to be able to participate in treatment.

42.   During the call, he made several suggestions, such as apps to use with Plaintiff's phone

that Ms. Liora rejected.  When Mr. Parsons suggested to Ms. Liora that there may be phone apps that could be used to improve amplification to Plaintiff's hearing aid, Ms. Liora stated that Sierra Tucson could not approve the use of phone apps to assist Plaintiff with hearing presenters, speakers and participants because of confidentiality concerns.

43.   When Mr. Parsons suggested to Ms. Liora that Sierra Tucson hold sessions and activities outside so that speakers and participants could pull their masks down to communicate while observing safe practices during COVID-19 restrictions, Ms. Liora told him this could not be done because speakers used technology, such as PowerPoint presentations, and those could not be used outside. During the call, Ms. Liora offered no other options to provide effective communication for Plaintiff.

44.   On or about March 3, 2021, Sierra Tucson agreed to write an order to allow Plaintiff access to use her cell phone during the day, which was not otherwise permitted except during quiet time in the lodge at night. The order was issued so Plaintiff could try to control the volume of her hearing aid more easily and to pair her cell phone's Bluetooth technology with a downloadable app that might produce captions on her phone.

45.   On or about March 6, 2021, the order permitting Plaintiff to use her cell phone during behavioral health programming reached her medical staff and was implemented.

46.   Oticon ON is an app that pairs to her hearing aid and allows individuals to increase or decrease volume of the hearing aid using an iPhone.

47.   Plaintiff explored the Oticon ConnectLine to connect her hearing aid to different audio devices, such as a microphone that the speaker wears, and use it to select a volume that allowed her to capture as much speech as possible.  However, the Oticon ConnectLine did not work without other assistive technology, such as StreamerPro and an FM listening system, which Defendants did not possess.

48.   Plaintiff downloaded various voice-to-text apps to try and access captions on her phone. However, the captioning service did not work in a group counseling setting because there was too much background noise and the group leader and participants were too far away for the app to

pick up the speech and produce accurate captions. The individual speaking needed to be close to the phone for the voice to text to be accurate and work effectively. It did not work in a group setting because the group therapy leader and the participants would need to be holding Plaintiff's phone for the amplification to work. It was impractical to pass the phone around the entire room to keep up with the discussion and question and answers. Plaintiff tried placing her phone in the middle of the group, but it was too loud and too much background noise for the app to work.

49.   Plaintiff's group therapy leader was present in group when Plaintiff tried to use the voice-to-text apps to create captions.

50.   On or about March 8, 2021, Plaintiff spoke to Mr. Kerwin and Ms. Hixson-Weiss that these voice-to-text apps did not work in the group setting and that Oticon ON and ConnectLine required other technology, such as the StreamerPro and a listening system or microphones and table mics.

51.   On or about March 12, 2021, Mr. Parsons spoke with Sierra Tucson's Chief Quality and Risk Officer Sue Menzie and Associate Clinical Director of Trauma Services David Cato. Mr. Parsons discussed that Plaintiff was not able to participate in the behavioral health services at Sierra Tucson because the facility was not addressing her communication needs. He asked if they had inquired about the clear, anti-fogging mask that Plaintiff had ordered and provided to them as a sample.

52.   On March 14, 2021, Mr. Parsons filed an online complaint with Defendants' third-party compliance department about his concerns that Plaintiff was not receiving the same care as other Sierra Tucson patients.

53.   On March 15, 2021, Mr. Parsons exchanged emails with Ms. Menzie and Mr. Cato to follow up on Sierra Tucson's plan for providing effective communication.

54.   In the email exchange, Mr. Parsons asked Ms. Menzie if Sierra Tucson looked into ordering the clear full, anti-fogging masks rather than the clear mask with a small cut-out for the lips.  Ms. Menzie stated that they looked into it and the mask was not on the approved list of vendors that they could order from, especially since they concluded that they had a viable alternative.

55.   Mr. Parsons sent a reply email, informing Ms. Menzie and Mr. Cato that they do not have

a viable alternative because he tried the same type of mask and it fogs up after a few words are spoken. Mr. Parsons asked if Sierra Tucson had looked into arranging CART services to provide Plaintiff with captioning. In response, he received a reply stating "be assured that we are continually looking for ways to meet your wife's needs."  However, Defendants provided no specific information about how they were meeting Plaintiff's communication access.

56.   On March 15, 2021, after receiving the unsatisfactory response from Ms. Menzie and Mr. Cato, Mr. Parsons emailed Sierra Tucson's Chief Executive Officer Valerie Kading about the lack of effective communication during Plaintiff's stay. Mr. Parsons told Ms. Kading that Plaintiff needed staff to use face shields or masks that do not fog up to read lips and CART services. In the email, Mr. Parsons provided Ms. Kading with a link to a specific clear mask that did not fog up and was FDA approved, which Plaintiff had ordered a sample and provided to Defendants.

57.   On March 16, 2021, Ms. Kading responded to Mr. Parsons saying she took his concerns seriously and that they would follow up with Sue Menzie and also explore the mask option Mr. Parsons and Plaintiff had presented.

58.   Neither Ms. Kading, Ms. Menzie, nor Mr. Cato or any other of Defendants' employees contacted Mr. Parsons about his concerns about the lack of effective communication.

59.   Mr. Parsons did not receive a response from the complaint he filed with Defendants' third-party compliance during Plaintiff's stay.

60.   On March 23, 2021, Sierra Tucson discharged Plaintiff.  She required emergency behavioral health and hospitalizations within one day of her discharge from Sierra Tucson.

61.   Throughout Plaintiff's inpatient stay with Defendants, until March 23, 2021, Plaintiff repeatedly, consistently, and sometimes desperately, informed Defendants that it was not providing her with effective communication, that she was not benefitting from Defendants' behavioral healthcare services without effective communication, and that she needed appropriate auxiliary aids and services to benefit from the behavioral healthcare.

62.   Plaintiff's husband Sean Parsons magnified and supplemented Plaintiff's requests that she needed effective communication and did not have equal access to the behavioral healthcare

services.

63.    Defendants did not take necessary steps to provide auxiliary aids and services for effective communication and was largely unresponsive to Plaintiff's repeated requests.

64.    During Plaintiff's admission, Defendants did not take necessary steps to ensure effective communication, such as:

      A.  Provide her with information and notice about an effective communication policy.

      B.  Assess her communication needs for the different types of healthcare communications occurring as part of the behavioral health treatment.

      C.  Substantively respond to Plaintiff and Mr. Parson's suggestions and alternatives for providing effective communication.

      D.  Provide her with remote CART services or equipment for assistive listening devices or systems.

      E.  Consider how COVID 19 practices requiring the use of masks affected her ability to communicate as a patient relying, in part, on lipreading to communicate and obtain appropriate clear, anti-fogging masks for clinical staff and patients,

      F.  Adequately train their clinical and compliance staff to ensure that they addressed communication access and resolved problems with communication access, and

      G.  Develop an effective communication access plan during her 34-day stay.

65.    During her inpatient stay, Plaintiff could not meaningfully participate in the healthcare recovery programs and activities, such as cognitive/dialectical behavior group therapy classes, EMDR, and individual therapy.

66.    As a result of Defendants' failure to furnish auxiliary aids and services and provide reasonable modifications to ensure that Plaintiff had effective communication during her stay, Plaintiff received inferior and unequal behavioral health services, was forced into higher, more restrictive levels of care throughout her stay, experienced frustration, anxiety, and stress due to the lack of effective communication, and incurred expenses for behavioral  healthcare services that were rendered inferior and ineffective without auxiliary aids and services.

67.   Within a few days of being discharged from Sierra Tucson, Plaintiff required additional emergency and in-patient behavioral health care.

## COUNT I

### Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 704

68.   Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

69.   Upon information and belief, at all relevant times, Defendants received federal financial assistance in the form of reimbursement from the federal Medicare and Medicaid programs and the Provider Relief Fund is therefore subject to the anti-discrimination provisions of the Rehabilitation Act, as herein described.

70.   At all times relevant herein, there was in full force and effect a statute known as the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et sequitur*, and its implementing regulations, 45 C.F.R. § 84.4(a). The Section 504 implementing regulation provides that "[n]o qualified handicapped person shall, on the basis of handicap be excluded from participation in, be denied the benefits of or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance." 45 C.F.R. § 84.4(a).

    A.  The regulation further provides:

        "A recipient, in providing any aid, benefit, or service, may not, ... on the basis of handicap: (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others ..." 45 C.F.R. § 84.4(b)(1)(ii).

    B.  Elsewhere, the Section 504 regulation states:

        "In providing health, welfare or other social services or benefits, a recipient may not on the basis of handicap: … (2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered non-handicapped persons. 45 C.F.R. § 84.52(a)(2).

    C.  In addition, "[a] recipient hospital that provides health services or benefits shall

establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R. § 84.52(c).

D.  The regulation further provides:

   "A recipient to which the subject applies that employs 15 or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R. § 84.52(d)(l).

E.  The regulation provides that such "auxiliary aids may include interpreters… and other aids for persons with impaired hearing… 45 C.F.R. § 84.52(d)(3).

F.  The Section 504 regulation defines a person who has a disability as any person who:
   "(i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 45 C.F.R. § 84.3(j)(l)(i)-(iii).

G.  A qualified person with a disability, with respect to the provision of health, welfare and social services, is a person "who meets the essential eligibility requirements for the receipt of such services." 45 C.F.R. § 84.3(k)(4).

71.   Through the acts and omissions alleged herein, Defendants has, solely on the basis of Plaintiff's disability, excluded Plaintiff from participating in its services, denied Plaintiff the benefit of its services, denied Plaintiff the opportunity to participate in her own healthcare, and subjected Plaintiff to discrimination in violation of 29 U.S.C. § 794. *et seq*., and the regulations promulgated thereunder, and have resulted in injury to Plaintiff.

72.   Knowing that Plaintiff requested and required clear masks for lipreading and CART services to achieve effective communication with doctors and staff, Defendants' acts and omissions alleged herein violated the Rehabilitation Act and its implementing regulations in one or more or all of the following manners:

A.  Defendants intentionally and deliberately discriminated against Plaintiff by denying her the opportunity for the full and equal enjoyment of its programs, services and

activities.

B.  Defendants intentionally and deliberately discriminated against Plaintiff by denying her the opportunity to participate in or benefit from its programs, services and activities.

C.  Defendants intentionally and deliberately discriminated against Plaintiff by offering or affording her services that are not equal to those services afforded to other individuals without hearing impairments.

D.  Defendants intentionally and deliberately discriminated against Plaintiff by failing to make reasonable modifications in policies, practices, or procedures.

E.  Defendants intentionally and deliberately discriminated against Plaintiff by failing to establish a procedure for effective communication with Plaintiff for the purpose of providing health care.

F.  Defendants intentionally discriminated against Plaintiff by deliberately failing to provide Plaintiff with appropriate auxiliary aids and services, such as an on-site sign language interpreter or effective video remote interpreting services, despite knowing the failure to do so would likely result in harm to the Plaintiff's federally protected rights and failed to act upon that likelihood.

G.  Defendants has otherwise discriminated against Plaintiff.

73.  The Rehabilitation Act explicitly authorizes the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

74.  Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42

U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

75. As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

76. 42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

77. Plaintiff is also entitled to other forms of compensatory damages beyond emotional-distress damages. Defendants are subject to remedies traditionally available in suits for breach of contract. Here, when patients like Plaintiff arrive at Defendants' facility for treatment, they expect that they will be able to communicate with their providers about their care. Plaintiff also had an expectation interest in being able to communicate with and be informed about her care by Defendants' staff in her primary or preferred method of communication or through some other equally effective form of communication because that is what federal antidiscrimination laws require.

78. Defendants denied Plaintiff these expectation interests by failing to accommodate her disability. Accordingly, Plaintiff should be entitled to compensatory damages under her expectation interest.

79. Plaintiff has also suffered stigmatic injury and dignitary harm as a result of Defendants' discriminatory conduct.

80. Plaintiff seeks nominal and compensatory damages as set forth above, and attorneys' fees, costs, and disbursements for the injuries and loss she sustained as a result of Defendants' discriminatory conduct and deliberate indifference).

81. Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of

the Rehabilitation Act, 29 U.S.C. § 794(a), as Defendants' conduct has inflicted injury and damages upon Plaintiff, including loss of a civil right, mental anguish, and mental pain and suffering.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A.  An order enjoining Defendants from discriminating against Plaintiff, requiring Defendants to (i) adopt and implement a legally compliant communication access policy; (ii) make available to Plaintiff an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are hard of hearing;

B.  An award of compensatory monetary damages;

C.  An award of Nominal Damages

D.  An award of attorneys' fees and costs; and

E.  Such other relief as the Court deems just.

## **COUNT II**
### **Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 et seq**

75.  Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

76.  At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

77.  At all times relevant to this action, Defendants received federal financial assistance, including Medicare and Medicaid reimbursements, and has been principally engaged in the business of providing health care.  Thus, Defendants are a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

78.  Based upon information and belief, as Defendant Acadia Healthcare participates in

Medicare and Medicaid and the Provider Relief Fund funding from the Department, it is a covered entity subject to compliance with Section 1557.

79.   Since March 2010, there was in full force and effect a statute known as the Patient Protection and Affordable Care Act (the "Affordable Care Act" or "ACA"), 42 U.S.C. § 18001, *et seq.*, Pub.L. 111-148. Section 1557 of the Affordable Care Act prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities. 42 U.S.C. § 18116. Section 1557's implementing regulations, 45 C.F.R. §§ 92.1 – 92.203, effective as of July 18, 2016, apply to health programs or activities administered by recipients of Federal financial assistance from the Department of Health and Human Services.

80.   The implementing regulations of Section 1557 prohibit discrimination of an individual on the basis of disability, *inter alia*, and prohibit an individual from being excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination under any health program or activity. *See* 45 C.F.R. § 92.101(a)(1). Those regulations, in pertinent part, require covered entities to:

A.   Take appropriate initial and continuing steps to notify beneficiaries, enrollees, applicants and members of the public:

(1)   that the covered entity does not discriminate on the basis of race, color, national origin, sex, age, or disability in its healthcare programs or activities. 45 C.F.R. §92.8 (a)(1);

(2)   that the covered entity provides appropriate auxiliary aids and services, including qualified interpreters for individuals with disabilities and information in alternate formats, free of charge and in a timely manner, when such aids and services are necessary to ensure an equal opportunity to participate to individuals with disabilities. 45 C.F.R. §92.8 (a)(2);

(3)   how to obtain aids and services. 45 C.F.R. §92.8 (a)(4);

(4)   the identification of, and contact information for, the responsible employee designated to be responsible for adoption of grievance procedures. 45 C.F.R.

§92.8 (a)(5);

(5)     the availability of grievance procedures and how to file a grievance pursuant to §92.7(b). 45 C.F.R. §92.8 (a)(6); and

(6)     how to file a discrimination complaint with the Department of Health and Human Services Office of Civil Rights. 45 C.F.R. §92.8 (a)(7).

B.     That a covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities, in accordance with the standards found at 28 C.F.R. §§ 35.160 through 35.164. 45 C.F.R. § 92.202(a).

81.   28 C.F.R. §§ 35.160 through 35.164 are the communication access standards required of public entities under Title II of the ADA. As applied to Section 1557 covered entities, the Title II regulations require them to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). In addition, a covered entity "shall furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities, … companions, … an equal opportunity to participate in, and enjoy the benefits of, a service, program or activity of a [covered] entity," 28 C.F.R. § 35.160(b)(1); and "[i]n determining what types of auxiliary aids and services are necessary, a [covered] entity shall give *primary consideration* to the requests of individuals with disabilities …." 28 C.F.R. § 35.160(b)(2) (emphasis added).

Defendants had a duty under Section 1557 to give primary consideration to Plaintiff's communication preference and provide her with clear masks for lipreading and CART services.

82.   In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.  28 C.F.R. § 35.160(b), *cited by* 45 C.F.R. § 92.102(a).

83.   Defendants' acts and omissions violated Section 1557 and its implementing regulations as

Defendants did not take appropriate steps to ensure that communications with Plaintiff were as effective as communications with others in its healthcare services, and Defendants failed to meet what Defendants were legally required to do under Section 1557 and the standards found at 28 C.F.R. §§ 35.160 through 35.164. 45 C.F.R. § 92.202(a).

84.   Section 1557's implementing regulations provide that the enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act, *inter alia*, shall be available for purposes of Section 1557 as implemented by this part, and "compensatory damages for violations of Section 1557 are available in appropriate administrative and judicial actions brought under this rule." *See* 45 C.F.R. § 92.301.

85.   Defendants' conduct constituted violations of Section 1557.

86.   Under the ACA, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

87.   As set forth above, Defendants discriminated against Plaintiff on the basis of her disability in violation of the ACA and its implementing regulations.

88.   Defendants have also failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA.

89.   The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to Plaintiff–that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act. 42 U.S.C. § 18116(a).

90.   In turn, the Rehabilitation Act explicitly authorizes the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this

title.

91. Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

92. As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

93. 42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

94. Plaintiff is also entitled to other forms of compensatory damages beyond emotional-distress damages. Defendants are subject to remedies traditionally available in suits for breach of contract. Here, when patients like Plaintiff arrive at Defendants' facility for treatment, they expect that they will be able to communicate with their providers about their care. Plaintiff also had an expectation interest in being able to communicate with and be informed about her care by Defendants' staff in her primary or preferred language or through some other equally effective form of communication because that is what federal antidiscrimination laws require.

95. Defendants denied Plaintiff these expectation interests by failing to accommodate her disability. Accordingly, Plaintiff should be entitled to compensatory damages under her expectation interest.

96. Plaintiff has also suffered stigmatic injury and dignitary harm as a result of Defendants' discriminatory conduct.

97. Plaintiff seeks nominal and compensatory damages as set forth above, and attorneys' fees,

costs, and disbursements for the injuries and loss she sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

98.   Accordingly, Plaintiff seeks injunctive relief, nominal and compensatory damages, and attorneys' fees and costs for the injuries and loss she sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

99.   Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.   An order enjoining Defendants from discriminating against Plaintiff, requiring Defendants to (i) adopt and implement a legally compliant communication access policy; (ii) make available to Plaintiff an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are hard of hearing;

B.   An award of compensatory monetary damages;

C.   An Award of Nominal Damages

D.   An award of attorneys' fees and costs; and

E.   Such other relief as the Court deems just.

## COUNT III

**Violation of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq**

100.  Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

101.  Title III of the ADA ("Title III") provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. §

12182(a).

102.   Defendants are entities other than state or local governments or instrumentalities thereof. Defendants own or operate healthcare facilities including hospitals, clinics, and residential and outpatient treatment centers, where Defendants provide healthcare services.

103.  Defendants' healthcare services are available to the public.

104.  Plaintiff is deaf and is an individual with disabilities within the meaning of the ADA.

105.  Plaintiff sought healthcare services at Defendants' healthcare facilities and will seek healthcare services at such facilities as necessary for behavioral health treatment.

106.  By failing to provide effective communication, including through the failure to provide auxiliary aids and services, such as remote Computer-Aided Realtime Transcription (CART) and assistive listening devices compatible with hearing aids with Bluetooth technology, Defendants fail to provide deaf or hard of hearing persons with equal access to the healthcare services and accommodations they provide to the public, in violation of 42 U.S.C. § 12182(b)(2)(A)(iii).

107.  Defendants' failure to make reasonable modifications to their policies, practices, or procedures, such as using clear, anti-fogging masks instead of opaque masks to permit lipreading, when necessary to ensure deaf or hard of hearing individuals have full and equal access to their healthcare services and accommodations violates 42 U.S.C. § 12182(b)(2)(A)(ii).

108.   Defendants' conduct constitutes an ongoing and continuous violation of Title III, and unless restrained from doing so, Defendants will continue to violate the ADA. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiff have no adequate remedy at law. Consequently, Plaintiff is entitled to injunctive relief pursuant to section 308 of the ADA, 42 U.S.C. § 12188(a), as well as reasonable attorneys' fees and costs, 42 U.S.C. § 12205.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

A. Declare that Defendants' discriminatory practices as set forth above violate Title III of the ADA;

B. Enjoin and restrain Defendants, their officers, employees, agents, successors, and all

other persons or corporations in active concert or participation with Defendants, from:

i. Failing to take necessary steps to provide auxiliary aids and services for effective communication, in violation of Title III, 42 U.S.C. § 12182(b)(2)(A)(iii) ;

ii.  Refusing to make reasonable accommodations that may be necessary because of the individual is deaf or hard of hearing, in violation of Title III, 42 U.S.C. § 12182(b)(2)(A)(ii); and

C. Intimidating and interfering with any person in the exercise or enjoyment of the rights granted or protected by ADA, in violation of 42 U.S.C. § 12203(b).

D. Order Defendants to take such actions as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of their unlawful conduct, including implementing policies and procedures to ensure that Plaintiff is not discriminated against because of disability;

E. Award courts costs and reasonable attorneys' fees to Plaintiff; and.

F. Order such additional relief as the interests of justice require.

## COUNT IV

### Violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq

109.  Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

110.  This action is brought to enforce the requirements of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, et. seq.

111.  Defendants own and/or lease dwellings within the meaning of U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

112.  The FHA applies to all dwellings "*except as exempted by sections 803(b) [§ 3603(b)] and 807 [§ 3607] of this title*." 42 U.S.C. § 3604 (emphasis added); *see also* 42 U.S.C. § 3603(a) (stating that upon enactment, the FHA's prohibition of discrimination in the sale or rental of dwellings would immediately cover four types of dwellings, and after December 31, 1968, such

coverage would extend to "all other dwellings except as exempted by [Section 3603(b)]").

113.  The inpatient program and the residential treatment center at Sierra Tucson are "dwellings" within the meaning of the Fair Housing Act.

114.  The FHA provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

115.  Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, polices, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

116.  Defendants discriminated against Plaintiff in the terms and conditions of the stay in the dwelling by refusing to grant her a reasonable accommodation of taking necessary steps to ensure effective communications during her stay in the dwelling, which would have allowed Plaintiff access and an opportunity to participate, use and enjoy services provided by Defendants' facilities that are connected to their dwellings and which equally situated hearing residents are able to enjoy.

117.  Defendants discriminated against Plaintiff by failing to provide remote CART services for communications in larger groups, settings or areas with background noise and refusing to provide clear, anti-fogging masks for her and others to wear to permit her to use lipreading skills in one-on-one communications, in violation of 42 U.S.C. § 3604(f)(2) and (f)(3)(B).

118.  Defendants discriminated against Plaintiff on the basis of her disability, in violation of the above-cited provisions of the FHA.

119.  Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), and has suffered from emotional distress as a result of Defendants' discriminatory conduct.

120.  Plaintiff is therefore entitled to nominal damages as a result of Defendants' discriminatory conduct as hereinbefore alleged. 42 U.S.C. § 3604, et. seq.

121.  Plaintiff is further entitled to entitled to compensatory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to the FHA. 42 U.S.C. § 3613(c).

122. Defendants made housing unavailable by refusing to grant Plaintiff a reasonable

accommodation in rules, policies, practices, or services, including taking steps that were necessary to ensure effective communications with Plaintiff, when such accommodations were necessary to afford her an equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(1) and (f)(3)(B).

123. Defendants' discriminatory actions were intentional, willful, and taken in disregard of the rights of the Plaintiff.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A. Declare that Defendants' discriminatory housing practices as set forth above violate the Fair Housing Act;

B. Enjoin and restrain Defendants, their officers, employees, agents, successors, and all other persons or corporations in active concert or participation with Defendants, from:

      i. Discriminating in the sale or rental, or otherwise making unavailable or denying, a dwelling to any buyer or renter because of disability, in violation of 42 U.S.C. § 3604(f)(1);

      ii. Discriminating against any person in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2);

      iii. Refusing to make reasonable accommodations in rules, policies, practices, or services, including taking necessary steps to provide effective communication, when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B); and

C. Order Defendants to take such affirmative steps as may be necessary to restore, as nearly as practicable, Plaintiff to the position she would have been in but for the discriminatory conduct;

D. Order Defendants to take such actions as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of their unlawful conduct, including implementing policies and procedures to ensure that no residents

are discriminated against because of disability;

E.  Award monetary damages to Plaintiff pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1);

F. Award Nominal Damages to Plaintiff

G. Award punitive damages to Plaintiff; and

H. Order such additional relief as the interests of justice require.

## COUNT V

### Violation of the Arizonans with Disabilities Act, A.R.S. § 41-1492

124.  Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

125.  Plaintiff's claims arise under the Arizonans with Disabilities Act, A.R.S. §§ 41-1492 (the "AzDA"), and its implementing administrative rules under Ariz. Admin. Code §§  R-10-3-401 – R-10-3-412.

126.  Plaintiff is a person with a disability as that term is defined and interpreted by AzDA. A.R.S § 41-1492 defines disability as a "physical or mental impairment that substantially limits one or more major life activities." Under § 41-1492.12, the determination of whether an individual's impairment is substantially limited is determined without benefit of mitigating measures, such as hearing aids.

127.  Defendants are healthcare providers covered under A.R.S. § 41-1492(11)(f), public accommodations, include "any . . . professional office of a health care provider, hospital or other service establishment."

128.  AzDA defines discrimination by public accommodations to include "[a] failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of reasonable modifications in policies, practices or procedures or auxiliary aids and services, unless the entity can demonstrate that taking these steps would fundamentally alter the nature of the goods, service, facility, privilege, advantage or accommodation being offered or would result

in an undue burden. A.R.S. § 41-1492.02(G)(3); *see also Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 904–05 (9th Cir. 2019) (Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations" to people with disabilities, 42 U.S.C. § 12182(a), and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services").

129. Auxiliary aids and services include but are not limited to computer–aided transcription services, closed captions, and written materials as well as listening devices. A.A.C. R10-3-404 (incorporating the requirements of 28 C.F.R. § 36.303(b)).

130. Public accommodation "should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication," and the public accommodation itself is independently responsible for making the "ultimate decision as to what measures to take." A.A.C R10-3-404 (incorporating 28 C.F.R. § 36.303(c)(1)(ii)). However, the measures that are taken must provide effective communication.

131. The type of auxiliary aid and service necessary to ensure effective communication will vary in accordance with the nature of the individual's disability, the method of communication used by the individual as well as the nature, length and complexity of the communication involved and the context in which a communication is taken place. However, in determining what types of auxiliary aids and services are necessary, a public accommodation must take reasonable steps to make the individual's experience less onerous and more akin to that enjoyed by non-disabled patients. *See cf. Baughman v. Walt Disney World Co.,* 685 F.3d 1131, 1136 (9th Cir. 2012) (ADA Title III case involving reasonable modifications of policies, practices and procedures).

132. Defendants intimidated and interfered with Plaintiff in the exercise or enjoyment of, of her right to the protections of AzDA, such as treating her requests for reasonable modifications and auxiliary aids and services as if they were symptoms of her behavioral health disability in violation of A.R.S. § 41-1492.10(B).

133. The acts and omissions of Defendants violated and continue to violate the AzDA and its implementing rules in one or more or all of the following manners, as Defendants has discriminated against Plaintiff by:

A.   Denying her the opportunity for the full and equal enjoyment of Defendants' services, programs and activities.

B.   Denying her the opportunity to participate in or benefit from Defendants' services, programs and activities.

C.   Offering or affording her services that are not equal to those services afforded to other individuals who are not hard of hearing.

D.   Failing to make reasonable modifications in policies, practices, or procedures, which are necessary to afford Defendants' services, programs and activities to Plaintiff.

E.   Intentionally failing to provide Plaintiff with appropriate auxiliary aids and services to achieve effective communications and to participate in her own healthcare.

F.   Failing to train staff about its obligations to provide auxiliary aids and services.

G.   Intimidating and interfering with her right to exercise and enjoy these rights.

H.   Otherwise having discriminated against the plaintiff because of her disability, including treating her as a "reactive" and non-compliant when she opposed unlawful practices of failing to provide effective communication.

134. As a proximate result of Defendants' violations of the AzDA, Defendants have inflicted injury and damages upon the Plaintiff, including loss of a civil right, mental anguish, humiliation, and mental pain and suffering.

135. Defendants' conduct constitutes ongoing and continuing violations of the AzDA. Unless restrained from doing so, Defendants will continue to violate the AzDA.

136. Plaintiff is entitled to reasonable attorney's fees as part of the costs, pursuant to A.R.S. §

41-1492.09(F).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.    An order enjoining Defendants from discriminating against Plaintiff, requiring Defendants to (i) adopt and implement a legally compliant communication access policy; (ii) make available to Plaintiff an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are deaf or hard of hearing;

B.    An award of compensatory money damages, including out of pocket expenses and emotional distress damages.

C.    Award Nominal Damages to Plaintiff

D.    An award of attorneys' fees and costs;

E.    Such other relief as the Court deems just.

## COUNT VI

### Violation of the Arizona Fair Housing Act, A.R.S. § 41-1491 et seq

137.  Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

138.  The inpatient program and the residential treatment center at Sierra Tucson are "dwellings" within the meaning of the Arizona Fair Housing Act.

139.  Defendants made housing unavailable by refusing to grant Plaintiff a reasonable accommodation in rules, policies, practices, or services, including taking steps that were necessary to ensure effective communications with Plaintiff, when such accommodations were necessary to afford her an equal opportunity to use and enjoy a dwelling, in violation of A.R.S. § 1491.19(A) and (E)(2).

140.  Defendants discriminated against Plaintiff in the terms and conditions of the stay in the dwelling by refusing to grant her a reasonable accommodation of taking necessary steps to

ensure effective communications during her stay in the dwelling, such as failing to provide remote CART services for communications in larger groups, settings or areas with background noise and refusing to provide clear, anti-fogging masks for her and others to wear to permit her to use lipreading skills in one-on-one communications,  in violation of A.R.S. § 1491.19(B) and (E)(2).

141.  Defendants intimidated and interfered with Plaintiff in the exercise or enjoyment of the rights granted or protected by the Arizona Fair Housing Act, including A.R.S.  41-§ 1491.19, such as treating Plaintiff's request for effective communication and symptoms of her behavioral health disability in violation of A.R.S.  41-§ 1491.18.

142.  Plaintiff is an "aggrieved person" within the meaning of A.R.S.  41-§ 1491(1).

143.  Defendants' discriminatory actions were intentional, willful, and taken in disregard of the rights of the Plaintiff.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

1.      Declare that Defendants' discriminatory housing practices as set forth above violate the Fair Housing Act;

2.      Enjoin and restrain Defendants, their officers, employees, agents, successors, and all other persons or corporations in active concert or participation with Defendants, from:

A. Discriminating in the sale or rental, or otherwise making unavailable or denying, a dwelling to any buyer or renter because of disability, in violation of A.R.S. § 1491.19(A) and (E)(2);

B. Discriminating against any person in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of A.R.S. § 1491.19(B) and (E)(2);

C. Refusing to make reasonable accommodations in rules, policies, practices, or services, including taking necessary steps to provide effective communication, when such accommodations may be necessary to afford a person with a disability equal opportunity to use

and enjoy a dwelling, in violation of A.R.S. § 1491.19 (E)(2); and

        D. Intimidating and interfering with any person in the exercise or enjoyment of the rights granted or protected by the Arizona Fair Housing Act, including A.R.S. 41-§ 1491.19, in violation of A.R.S. 41-§ 1491.18.

        3.     Order Defendants to take such affirmative steps as may be necessary to restore, as nearly as practicable, Plaintiff to the position she would have been in but for the discriminatory conduct;

        4.     Order Defendants to take such actions as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of their unlawful conduct, including implementing policies and procedures to ensure that no residents are discriminated against because of disability;

        5.     Award actual and punitive damages to Plaintiff pursuant to A.R.S. § 1491.33;

        6.     Award Nominal Damages to Plaintiff

        7. Award courts costs and reasonable attorneys' fees to Plaintiff pursuant to A.R.S. § 1491.36

        8.     Order such additional relief as the interests of justice require.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all of the issues a jury properly may decide, and for all of the requested relief a jury may award.

RESPECTFULLY SUBMITTED this 8th day of May, 2023.

**RICHARDS & MOSKOWITZ PLC**


*/s/ William A. Richards*
William A. Richards
1850 N. Central Avenue, Suite 2010
Phoenix, AZ 85004

Arizona Center for Disability Law
Rose A. Daly-Rooney
177 North Church Avenue, Suite 800
Tucson, Arizona 85710

AND

EISENBERG & BAUM, LLP
Andrew Rozynski
24 Union Square East, Penthouse
New York, NY 10003

*Attorneys for Plaintiff*

# EXHIBIT A-1
# to First Amended
# Complaint



# EXHIBIT A-2
# to First Amended
# Complaint



# EXHIBIT B
# to First Amended
# Complaint



Home    About    Interpreting    CART    Community    DeafBlind    Events    Videos    Donate

CART Services



# REQUEST A CART PROVIDER ON-LINE

### Request CART Professional Now

  CART requests requires at least a 48-hours advance notice.  

## Communication Access Real-time Translation (CART)

Communication access real-time translation (CART), also called real-time captioning, is the general name of the system that a CART professional converts speech to text. A trained professional uses keyboard or stenography methods to transcribe spoken speech into written text. CART professionals have qualifications for added expertise (speed and accuracy) as compared to court reporters and other stenographers.

Display options include computers, projection screens, monitors or mobile devices. The real-time text may be displayed as a full screen of large text at the front of the room or the text may be incorporated onto the same screen as a PowerPoint presentation.

It is also useful for deaf people whose first language (American Sign Language) is different from the language being used in the meetings (English), or hard of hearing people to understand speakers with different voices and accents in many group situations (at work, in education, community events), to have a "transcript", and for learning languages. After the event, transcripts will be provided for free. And customers find this extremely useful.

### On-site CART



On-site CART is provided on-site at local meetings, classes, training sessions and special events. A provider will bring equipment to the site and set it up. Customers may have to provide projectors and screens. How does it work?  1) The speaker voices the content information, 2) the voiced content information is then transmitted to a CART professional, who then 3) transcribes the voiced content into textual English for the Deaf/HH individual to access the content.

### Remote CART



Remote CART  is exactly the same as on-site CART except the provider is in a remote location.  A voice connection such as a telephone, cellphone, or computer microphone is used to send the voice to the operator, and the real-time text is transmitted back over a modem, Internet, or other data connection. This is the most common used method. The process works that same as the On-site CART, with the only exception is that the CART Professional is located remotely.

Request CART Professional Now



### ABOUT
Mission
Board
Staff
Careers
Donate
eNews

### SERVICES
Interpreting
CART
Community
DeafBlind
ASL Classes

### OTHERS
Pink Wings of Hope
Rustic Lantern Films

### CONTACT INFO
FRONT DESK
Phone/VP: (314) 714-6400
FAX: (314) 266-7427
Secure online contact

INTERPRETING SERVICES
Phone: (314) 968-8868
Toll Free: (888) 898-3323
Secure online contact

25 E. Frisco Avenue, St. Louis, MO 63119

    



   

Copyright DEAF Inc. 2008-2018  |  Privacy Policy  |  Terms & Conditions

**FILED**
Gary Harrison
**CLERK, SUPERIOR COURT**
5/9/2023 2:02:20 PM
**BY: ALAN WALKER /s/**
**DEPUTY**
C20230734
HON. GARY J. COHEN

Person/Attorney Filing: WILLIAM A. RICHARDS
Mailing Address: 1850 N Central Avenue Suite 2010
City, State, Zip Code: Phoenix, AZ 85004
Phone Number: (602)595-7800
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 013381, Issuing State: AZ
 Attorney E-Mail Address:  brichards@rmazlaw.com

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

# IN AND FOR THE COUNTY OF PIMA

Case No. **C20230734**

HON. GARY J. COHEN
**PRAECIPE**

To The Clerk:

Please issue:

[X]  Summons

# Liddy Legal Support Services

PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737

| Client Matter | Parsons |
|---|---|
| Account | # 1010 |
| Invoice | # 66689 |
| Liddy | # 432295-1 |

FILED
GARY L. HARRISON
CLERK, SUPERIOR COURT
23 MAY 16 PM 4: 11

BY _____
BEATRIZ OLIVARES
DEPUTY

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

CHRISTINE PARSONS,

                **Plaintiff(s) / Petitioner(s),**

vs

ACADIA HEALTHCARE COMPANY, INC., et al.,

                **Defendant(s) / Respondent(s).**

**CERTIFICATE OF SERVICE
BY PRIVATE PROCESS SERVER
Case No. C20230734**

# ORIGINAL

**ENTITY/PERSON TO BE SERVED:** Sierra Tucson, Inc. c/o CT Corporation System, Statutory Agent

**PLACE OF SERVICE:** 3800 N Central Avenue, Suite 460, Phoenix, AZ, 85012

**DATE OF SERVICE:** On the **11th** day of **May**, **2023** at **11:41 AM** County **Maricopa**

[ ] PERSONAL SERVICE  [X] Left a copy with a person authorized to accept service.  [ ] At this usual place of abode, I left a copy with a person of suitable age and discretion residing therein.

**Name of Person Served and Relationship/Title** Served on CT Corporation System, Statutory Agent, by serving Stefan Andrews, Intake Specialist.

on **05/11/2023** we received the following documents for service:

Summons | First Amended Complaint | and Certificate of Compulsory Arbitration

**Received from RICHARDS & MOSKOWITZ, ( WILLIAM A. RICHARDS #013381 )**

PROCESS SERVER: Floyd R. Brown #8388

**The undersigned states: That I am a certified private process server in the county of Maricopa and am an Officer of the Court.**

SIGNATURE OF PROCESS SERVER: *Floyd R Brown*    Date: 5/11/2023

| Item | Amount |
|---|---|
| Service of Process | $20.00 |
| Minimum Mileage | $36.00 |
| Rush Charge Service | $35.00 |
| Copies | $8.75 |
| Doc. Prep Fee | $12.00 |

**Tax ID# 90-0533870**
I declare under penalty of perjury that the foregoing is true and correct and was executed on this date.

        Total    $111.75

# Liddy Legal Support Services

PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737

FILED
GARY L. HARRISON
CLERK, SUPERIOR COURT

23 MAY 16 PM 4: 11

Client Matter    Parsons
Account       # 1010
Invoice       # 66690
Liddy         # 432299-1

BY_____
DEPUTY
BEATRIZ OLIVARES

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
### IN AND FOR THE COUNTY OF PIMA

**CHRISTINE PARSONS,**

Plaintiff(s) / Petitioner(s),

vs

**ACADIA HEALTHCARE COMPANY, INC., et al.,**

Defendant(s) / Respondent(s).

**CERTIFICATE OF SERVICE
BY PRIVATE PROCESS SERVER
Case No. C20230734**

ORIGINAL

**ENTITY/PERSON TO BE SERVED:** Sierra Tucson, LLC c/o CT Corporation System, Statutory Agent

**PLACE OF SERVICE:**          3800 N Central Avenue, Suite 460, Phoenix, AZ, 85012

**DATE OF SERVICE:** On the __11th__ day of __May__, _2023_ at __11:41__ AM    County _Maricopa_

| | |
|---|---|
| ☐ PERSONAL SERVICE  ☒ Left a copy with a person authorized to accept service. | ☐ At this usual place of abode, I left a copy with a person of suitable age and discretion residing therein. |

**Name of Person Served and Relationship/Title**    Served on CT Corporation System, Statutory Agent, by serving Stefan

Andrews, Intake Specialist.

on ____05/11/2023____ we received the following documents for service:

Summons | First Amended Complaint | and Certificate of Compulsory Arbitration

**Received from RICHARDS & MOSKOWITZ, ( WILLIAM A. RICHARDS #013381 )**

PROCESS SERVER: _Floyd R. Brown #8388_

**The undersigned states: That I am a certified private process server in the county of Maricopa and am an Officer of the Court.**

SIGNATURE OF PROCESS SERVER: _Floyd R Brown_                    Date: _5/11/2023_

| Item | Amount |
|---|---|
| Service of Process | $20.00 |
| Copies | $8.75 |
| Doc. Prep Fee | $12.00 |

**Tax ID#** 90-0533870
I declare under penalty of perjury that the foregoing is true and correct and was executed on this date.

Total    $40.75

# Liddy Legal Support Services

PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737

BEST COPY

FILED
GARY L. HARRISON
CLERK, SUPERIOR COURT

23 MAY 23 PM 4: 07

BY _____
CHRISTIAN J. BYLEWSKI   DEPUTY

Client Matter  Parsons
Account      # 1010
Invoice      # _____
Liddy        # 432386-1

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

CHRISTINE PARSONS,

                    Plaintiff(s) / Petitioner(s),

vs

ACADIA HEALTHCARE COMPANY, INC., ET AL.,

                    Defendant(s) / Respondent(s).

**CERTIFICATE OF SERVICE**
**BY PRIVATE PROCESS SERVER**
Case No. C20230734

**ENTITY/PERSON TO BE SERVED:** Acadia Healthcare Company, Inc. c/o CT Corporation System, Registered Agent

**PLACE OF SERVICE:**      300 Montvue Rd., Knoxville, TN, 37919

**DATE OF SERVICE:** On the 12th day of May , 2023 at 12:42 PM   County Knox

| [ ] PERSONAL SERVICE | [X] Left a copy with a person authorized to accept service. | [ ] At this usual place of abode, I left a copy with a person of suitable age and discretion residing therein. |

**Name of Person Served and Relationship/Title**   Served to Samantha Sutton, CT Representative, authorized to accept/receive service.

on ____5/11/2023____ we received the following documents for service:

Summons | First Amended Complaint | Certificate of Compulsory Arbitration

**Received from RICHARDS & MOSKOWITZ, ( WILLIAM A. RICHARDS #013381 )**

PROCESS SERVER: Melinda Urbina

The undersigned states: That I am a private process server in the county of Knox, State of Tennessee.

SIGNATURE OF PROCESS SERVER: _M. Url_____   Date: 05/16/2023

Tax ID# 90-0533870
I declare under penalty of perjury that the foregoing is true
and correct and was executed on this date.

Index of Record - Case# C20230734 

Documents

| Sequence Number | Document Type | Document Caption | File Date | Image |
|---|---|---|---|---|
| 1 | All Money Receipts | All Money Receipts 3585986 | 02/16/2023 | Link |
| 2 | Petition & Complaint | Parsons, C. COMPLAINT | 02/16/2023 | Link |
| 3 | Documents/Records Filed | Civil Cover Sheet System Generated | 02/16/2023 | Link |
| 4 | Summons/Subpoena | Summons Acadia Healthcare Company, Inc., Sierra Tucson LLC and Sierra Tucson, Inc. System Gener | 02/16/2023 | Link |
| 5 | Notice Of Impending Dismissal | NOTICE RE IMPENDING DISMISSAL | 04/24/2023 | Link |
| 6 | Complaint/Brief | First Amended Complaint | 05/09/2023 | Link |
| 7 | Exhibits | Exhibit A-B to First Amended Complaint | 05/09/2023 | Link |
| 8 | Praecipe | Praecipe | 05/09/2023 | Link |
| 9 | Summons/Subpoena | Summons | 05/09/2023 | Link |
| 10 | Summons/Subpoena | Summons | 05/09/2023 | Link |
| 11 | Summons/Subpoena | Summons | 05/09/2023 | Link |
| 12 | Certificate | Certificate of Compulsory Arbitration | 05/10/2023 | Link |
| 13 | Certificate Of Service | CERTIFICATE OF SERVICE | 05/16/2023 | Link |
| 14 | Certificate Of Service | CERTIFICATE OF SERVICE | 05/16/2023 | Link |
| 15 | Certificate Of Service | CERTIFICATE OF SERVICE | 05/23/2023 | Link |